**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| MARGARITA VILLAGRAN, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | CIVIL ACTION NO. H-05-2687 |
| | § | |
| FREEWAY FORD, LTD., *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

Margarita Villagran sues on her own behalf and on behalf of a class of people sent mailings by Freeway Ford, Ltd., an automobile dealership, and its general partner, Stephen E. Prather, Inc.  Villagran alleges that the mailings violated the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681 *et seq.,* because they used information obtained without authorization from the addressees' credit reports, for a purpose not permitted under the Act. The FCRA allows companies such as the defendants to use information obtained from consumers' credit reports for communications that extend "firm offers of credit."  The FCRA prohibits the use of such information to advertise rather than extend "firm offers of credit." Villagran alleges that the mailings did not extend "firm offers of credit."  She seeks damages under 15 U.S.C. § 1681n(a), which provides that for each violation, the consumer may recover "any actual damages sustained by the consumer as a result of [a violation] or damages of not less than $100 and not more than $1,000," punitive damages, attorney's fees, and costs.

Villagran has moved for partial summary judgment on her claim that the mailing she and others on the same mailing list received, as well as three other similar mailings, violated the FCRA because they did not extend "firm offers of credit." (Docket Entry No. 65). The defendants have responded, (Docket Entry No. 67), and Villagran has replied, (Docket Entry No. 69). The defendants have cross-moved for summary judgment that, as a matter of law, the mailing sent to Villagran did constitute a "firm offer of credit." The defendants have alternatively cross-moved for partial summary judgment that, even if the mailing to Villagran did violate the FCRA, the violation was not willful. (Docket Entry No. 66). As to the other mailings, the defendants argue that Villagran may not assert a claim based on a mailing she did not receive and that did not use information obtained by accessing her credit report. Villagran has responded, (Docket Entry No. 68), and the defendants have replied, (Docket Entry No. 73). Villagran has also moved to strike the defendants' summary judgment evidence. (Docket Entry No. 70). The defendants have responded to that motion. (Docket Entry No. 71). In addition, Villagran has amended her motion to certify a class action, (Docket Entry No. 78), and the defendants have responded, (Docket Entry No. 79).

Based on the motions, responses, and replies; the record; the parties' submissions; and the applicable law, this court denies Villagran's motion to strike; denies Villagran's summary judgment motion; grants the defendants' summary judgment motion; and denies Villagran's motion to certify a class action.[1] The reasons for these rulings are set out in detail below.

---

[1]   The court also grants the defendants' motion to supplement new authority in support of their motion for summary judgment. (Docket Entry No. 86).

2

I.      **Background**

The FCRA allows consumer credit-reporting agencies to furnish certain information

for credit transactions that a consumer did not initiate, as long as the creditor uses that

information within the statute's limits.  15 U.S.C. § 1681b.  A prospective creditor may

purchase information about an individual's credit from a credit-reporting agency in order to

prescreen the individual for creditworthiness based on preestablished eligibility criteria and

to extend "firm offers of credit" to an individual who meets the criteria.  A creditor may not,

however, use such information merely for advertising.

The Fifth Circuit has explained the process by which prospective creditors may obtain

and use information under the FCRA.  "In the pre-screening process, credit reporting

agencies compile lists of customers who meet specific criteria provided by the creditor, and

then provide the lists to a creditor, who uses the lists to solicit customers with firm offers for

credit in the form of pre-approved offers of credit."  *Kennedy v. Chase Manhattan Bank USA,*

*NA*, 369 F.3d 833, 841 (5th Cir. 2004).  Such preapproved "firm offers of credit" may be

conditioned on the consumer meeting the creditor's previously established criteria for

extending credit.  *Id.*  If the consumer meets the criteria, however, the credit must be

extended.  *Id.* at 841-42.

In June 2005, Margarita Villagran received a mailing from the defendants, Freeway

Ford, Ltd. and Stephen E. Prather, Inc.  The mailing stated:

Dear Margarita,

Are  you  considering  the  purchase  of  a  new  vehicle  but

3

concerned about not being able to secure the financing you need?

Margarita, you received this offer due to your payment history and you have qualified to participate in the Freeway Ford Guaranteed Approval Event.

You have been <u>Pre-Approved for $27,525</u> towards the purchase of your next car or truck!

At Freeway Ford, we take great pride in helping individuals purchase the vehicle of their choice regardless of their credit situation.

At Freeway Ford we understand that bad things happen to good people.  We will not promise you miracles, we do guarantee that we will do everything in our power to make you a satisfied customer by putting you in the driver's seat of the vehicle that you choose.

This is how we are different: we take your problem and make it our challenge.  No gimmicks, no pressure, you deserve to be treated with honesty and dignity.  Do not think that because you were turned down somewhere else or could not get the consideration you were looking for, that we too will not be able to secure financing for you.  We have a 100% Approval success rate in providing financing for people with special finance needs.

Please call Mr. Greene toll free at 1-800-743-2144 before July 2nd, 2005 for more information about our programs or stop by and see us.  We do appreciate your time and hope that we can earn your business.

Sincerely,

Steve Prather
President

(Docket Entry No. 65, Ex. A).  The mailing contained the following language near the

bottom, in smaller type:

> This offer may not be used in conjunction with any other advertised offer or discounted plan.  Only one trade in may be accepted on each purchase.  You must present this offer to Freeway Ford upon arrival.  Information from a consumer credit profile was used in conjunction with this offer.  This offer has been extended because criteria have been satisfied for the offer.  This offer may not be extended if after responding to this offer you do not meet the criteria used in this selection process.  Furthermore we must verify income and employment, review recipient's and spouse's credit and analyze equity position in collateral prior to final loan approval.  You have the right to prohibit recipient's credit profile from being used for similar prescreened offers by requesting by telephone to Experian at 1-888-567-8688.

(*Id.*).

Villagran did not respond to the mailing other than by filing this lawsuit.  Villagran has alleged and provided summary judgment evidence that she did not authorize the defendants to access or use information from her credit report.  Villagran alleges that the defendants used information from her credit report to send her a mailing that did not extend a "firm offer of credit" and therefore violated section 1681b of the FCRA.  Villagran argues that the "purported offer" in the mailing she received, as well as in the three mailings sent to others, "is vague and totally lacking in terms.  It has no value beyond a solicitation for loan business, the sending of which is not a permissible purpose for accessing a consumer report." (Docket Entry No. 26 at 4).[2]

---

[2] Villagran also alleged that the mailing's disclosures were not "clear and conspicuous," in violation of section 1681m(d) of the FCRA.  (Docket Entry No. 26 at 4–5).  That claim was dismissed because the 2003 amendments to the FCRA, passed as part of the Fair and Accurate Credit Transactions Act ("FACTA"), Pub. L. 108-159, eliminated private enforcement actions under that section.  (Docket Entry Nos. 16, 28); *see also*

Villagran has submitted copies of the mailing she received and three other mailings offering various credit incentives, sent by the defendants, which were not sent to Villagran. Villagran seeks to represent a class of approximately 80,000 individuals whose names were on lists the defendants used in 2005 to send these mailings.  The lists are not available; the number is based on information as to the number of mailings.  In this suit, Villagran asserts that each mailing is an FCRA violation.  She alleges a right to receive $1,000 in statutory damages for each violation, as well as an injunction, punitive damages, and her attorney's fees.

## II.     The Cross-Motions on Whether the Mailings are a "Firm Offer of Credit"

### A.      The Motions

Villagran moves for partial summary judgment on her claim that the defendants' mailings violate the FCRA because they did not constitute "firm offers of credit" under the Act.  Villagran primarily relies on Seventh Circuit cases as authority for her motion. These cases are *Cole v. U.S. Capital*, 389 F.3d 719 (7th Cir. 2004), and *Murray v. GMAC Mortgage Corp.*, 434 F.3d 948 (7th Cir. 2006).  *Cole* held that to be a "firm offer of credit," a mailing must contain sufficient information to allow the recipient to determine from the four corners of the mailing whether it is of value as an extension of credit.  389 F.3d at 726–27.  In *Cole*, the court held that the mailing at issue did not meet the criteria to be a "firm offer of credit."

---

*Perry v. First Nat'l Bank*, 459 F.3d 816, 819–23 (7th Cir. 2006); *Bruce v. Grieger's Motor Sales, Inc.*, 422 F. Supp. 2d 988, 990–93 (N.D. Ind. 2006); *Putkowski v. Irwin Home Equity Corp.*, 423 F. Supp. 2d 1053, 1060–62 (N.D. Cal. 2006); *Stavroff v. Gurley Leep Dodge, Inc.*, 413 F. Supp. 2d 962, 963–67 (N.D. Ind. 2006); *Murray v. Cross Country Bank*, 399 F. Supp. 2d 843, 845 (N.D. Ill. 2005); *Murray v. Household Bank (SB), N.A.*, 386 F. Supp. 2d 993, 996–99 (N.D. Ill. 2005).

The court cited the small amount of credit offered – $300 – to purchase a vehicle and the absence of such "material terms" as the precise interest rate, the method by which the interest will be compounded, and the repayment period, which made it "impossible for a court to determine from the pleadings whether the offer has value." *Id*. In *Murray*, the court affirmed that the test was whether the mailing had sufficient value on its face to be a "firm offer of credit." The court clarified that the issue was whether the mailing extended an offer that had value to the "normal" consumer, an objective inquiry rather than a consumer-specific evaluation. The court affirmed that to be a "firm offer," the mailing must include specific information on the material terms of the purported credit offer. 434 F.3d at 955. Villagran contends that under *Cole* and *Murray*, the defendants' mailings were as a matter of law "sham" rather than firm offers of credit.

The defendants cross-move for summary judgment that the mailing Villagran received does meet the criteria for a "firm offer of credit." The defendants rely on *Kennedy,* in which the Fifth Circuit interpreted the FCRA to "permit[] a creditor to make a 'conditional' firm offer of credit; that is, an offer that is conditioned on the consumer meeting the creditor's previously-established criteria for extending credit." *Kennedy*, 369 F.3d at 841. In *Kennedy*, the Fifth Circuit rejected the plaintiffs' claim that the defendant creditors had obtained their credit information in violation of the FCRA. The defendants sent preapproved offers of credit to the plaintiffs, but then refused to open credit card accounts for the plaintiffs after receiving detailed reports on the plaintiffs' credit history. Because the court found that the FCRA allows "conditional" firm offers of credit, such that "a firm offer of credit under the

7

Act really means a 'firm offer if you meet certain criteria,'" the court affirmed the district court's dismissal of the plaintiffs' complaint for failure to state a claim.  *Id.*  (internal quotations omitted).

The defendants in this case rely on cases that have cited *Kennedy* and the language of the FCRA to reject the *Cole* and *Murray* approach.  These courts do not look to whether the purported credit offer disclosed material loan terms.  *See, e.g., Putkowski v. Irwin Home Equity Corp.*, 423 F. Supp. 2d 1053 (N.D. Cal. 2006); *Poehl v. Countrywide Home Loans, Inc.*, 464 F. Supp. 2d 882 (E.D. Mo. 2006).  The defendants alternatively cross-move for partial summary judgment on the ground that Villagran has failed to raise a fact issue as to whether defendants' alleged violation of the FCRA as to her was willful.[3]

Each motion is examined below.

**B.    The Summary Judgment Standard**

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56(c).  The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact.  *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d

---

[3]  In September 2006, before this case was transferred to this court, the court in which the case was filed issued a brief opinion denying the defendants' "motion for summary judgment" on the issue of whether the mailing Villagran received constituted a firm offer of credit.  (Docket Entry No. 57).  The opinion was based on the record then before the court, which, as the court stated, did not disclose the criteria by which the recipients were preselected.  In the present motion, filed after discovery, the defendants have supplemented the record with evidence of the selection criteria.  (Docket Entry No. 66).  Given Villagran's motion for partial summary judgment on the issue of whether the mailings constituted firm offers of credit, the change in the record, and the present posture of the case, this court is not precluded from reconsidering the issue. *See Perillo v. Johnson*, 205 F.3d 775, 780–81 (5th Cir. 2000) (citing *United States v. O'Keefe*, 169 F.3d 281, 283 (5th Cir. 1999); *Castner v. First Nat'l Bank of Anchorage*, 278 F.2d 376, 380 (9th Cir. 1960).

347, 349 (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  If the burden of proof at trial lies with the nonmoving party, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently supports an essential element or claim.  *Celotex*, 477 U.S. at 330.  The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case.  *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005).  "An issue is material if its resolution could affect the outcome of the action."  *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  If the moving party fails to meet its initial burden, the summary judgment motion must be denied, regardless of the nonmovant's response.  *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings.  The nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim.  *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 302 (5th Cir. 2004).  This burden is not satisfied by

"some metaphysical doubt as to the material facts," "conclusory allegations," "unsubstantiated assertions," or "only a scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 (5th Cir. 1994).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. "Rule 56 mandates the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

### C.      The Fair Credit Reporting Act

#### 1.      The Statutory Provisions on a "Firm Offer of Credit"

Congress enacted the FCRA to protect a consumer's right to privacy in the information maintained by consumer credit-reporting agencies.  15 U.S.C. § 1681(a)(4) ("There is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.").  The FCRA restricts the circumstances under which creditors may obtain a consumer's credit report.  *Id.*, § 1681b(a).  A credit report may only be obtained with the consumer's written consent or for "permissible purposes."  *Id.*; *Cole v. U.S. Capital*, 389 F.3d 719, 725 (7th Cir. 2004).  One permissible purpose is to extend a "firm offer of credit" to the consumer.  15 U.S.C. § 1681b(c)(1)(B)(I); *Cole*, 389 F.3d at 725.  The FCRA defines a "firm offer of credit" as "any offer of credit or insurance to a consumer that will be honored if the

consumer is determined, based on information in a report to the consumer, to meet the specific criteria used to select the consumer for the offer."  15 U.S.C. § 1681a(l).  The offer may be conditioned on:  (1) preselected criteria bearing on credit worthiness; (2) verification that the consumer continues to meet such criteria; and (3) the consumer furnishing preselected and disclosed collateral.  *Id.*, § 1681a(l)(1–3).[4]  The criteria used to determine

---

[4]  Section 1681a(l) provides as follows:

The term "firm offer of credit or insurance" means any offer of credit or insurance to a consumer that will be honored if the consumer is determined, based on information in a consumer report on the consumer, to meet the specific criteria used to select the consumer for the offer, except that the offer may be further conditioned on one or more of the following:

(1)     The consumer being determined, based on information in the consumer's application for the credit or insurance, to meet specific criteria bearing on credit worthiness or insurability, as applicable, that are established

(A)     before selection of the consumer for the offer; and

(B)     for the purpose of determining whether to extend credit or insurance pursuant to the offer.

(2)     Verification

(A)     that the consumer continues to meet the specific criteria used to select the consumer for the offer, by using information in a consumer report on the consumer, information in the consumer's application for the credit or insurance, or other information bearing on the credit worthiness or insurability of the consumer; or

(B)     of the information in the consumer's application for the credit or insurance, to determine that the consumer meets the specific criteria bearing on credit worthiness or insurability.

(3)     The consumer furnishing any collateral that is a requirement for the extension of the credit or insurance that was

(A)     established before selection of the consumer for the offer of credit or insurance; and

(B)     disclosed to the consumer in the offer of credit or insurance.

creditworthiness must be "established . . . before selection of the consumer for the offer." *Id.*, § 1681a(l)(1).  A creditor must honor a firm offer of credit if, based on information in the consumer's credit report, the application for credit, or other information bearing on creditworthiness, the consumer meets the criteria initially used to select that consumer for the offer.  *Kennedy*, 369 F.3d at 840.

### 2.   The Case Law on a "Firm Offer of Credit"

Courts that have dealt with whether a mailing is a "firm offer of credit" permitted under the FCRA have generally taken one of two approaches.  In *Cole v. U.S. Capital, Inc.*, 389 F.3d 719 (7th Cir. 2004), the Seventh Circuit required that a mailing or similar communication must provide sufficiently specific information to enable the consumer to determine whether the offer is of "some value" in itself or is merely a solicitation.  *Id.*; *see also Murray v. GMAC Mortgage Corp.*, 434 F.3d 948 (7th Cir. 2006).  A number of district courts have followed this approach.  *See, e.g.*, *Hyde v. RDA, Inc.*, 389 F. Supp. 2d 658, 663–64 (D. Md. 2005) (requiring disclosure of the offer's amount of credit extended, interest rate, and repayment period).  A second line of cases does not read the FCRA as requiring such specific or detailed information.  *See, e.g.*, *Putkowski v. Irwin Home Equity Corp.*, 423 F. Supp. 2d 1053, 1060 (N.D. Cal. 2006).  The two lines of cases are discussed below.

### a.   The Seventh Circuit's Approach

In *Cole v. U.S. Capital, Inc.*, the defendant accessed the plaintiff's credit reports.

---

15 U.S.C. § 1681a(l).

Using the information obtained, the defendant sent the plaintiff a mailing stating that the plaintiff was "pre-approved to participate in an exclusive offer from U.S. Capital and Jerry Gleason Chevrolet" and was eligible to "receive a Visa or MasterCard with limits up to $2,000 as well as up to $19,500 in AUTOMOTIVE CREDIT!"  389 F.3d at 722.  The mailing included additional eligibility requirements, including that the recipient must not have a monthly car payment that exceeds 50% of her gross income, she must have an annual income of at least $18,000, she must meet certain debt-to-equity requirements, and all bankruptcies must be discharged.  The mailing stated that the plaintiff was not guaranteed a credit card but if the conditions for approval were met, the plaintiff was "guaranteed to receive a credit line of at least three hundred dollars for the purchase of a vehicle."  *Id.* at 723.  The court of appeals reversed the district court's grant of the defendant's motion to dismiss, finding support for the plaintiff's allegation that the defendant's offer was a "sham." *Id.* at 728.  The court reasoned that because the amount of credit offered was low ($300), and because the mailing stated that the credit could only be used toward the purchase of a vehicle at one dealership, the court could not determine from the pleadings and the mailing itself whether the offer had "value."  *Id.*  Under the *Cole* approach, to determine whether a mailing is a "guise for solicitation" or a firm offer of credit, a court examines not only whether the offer would have been honored if the consumer met the preselected eligibility criteria, but also whether and what information was provided as to the amount of credit offered; the stated rate of interest and the method of computation; and the length of any repayment period.  *Id.* at 728.

In *Perry v. First National Bank*, 459 F.3d 816 (7th Cir. 2006), the Seventh Circuit considered several of the factors listed in *Cole* and held that a mailing offering a major credit card with a low credit limit ($250), with relatively substantial fees and interest rates, could have value to the normal consumer and pass muster under the FCRA. The court noted that the Visa credit card offered in the mailing could be used "to purchase any products or services for which Visa is accepted." *Id.* at 825. The court distinguished *Cole* on the ground that the credit offered in that case only applied to the purchase of a vehicle at a single automobile dealership. *Id.* (citing *Cole*, 389 F.3d at 728). The court reasoned that the credit-card offer had value to consumers who were, for example, seeking to establish a credit rating for the first time or reestablish good credit. *Id.* The court concluded that although the offer was not "an attractive deal for the great majority of consumers," it was still a "firm offer of credit" permissible under the FCRA because it was "not without value." *Id.*

In *Murray v. GMAC Mortgage Corp.*, the Seventh Circuit provided further guidance on determining whether a mailing or similar communication is a "firm offer of credit." In that case, the plaintiff appealed the denial of her motion to certify a class of FCRA consumers. In examining the district court's findings, the appellate court stated that "to separate the use of credit data to sell products (forbidden) from the use of credit data to make firm offers of credit (allowed) . . . a court must determine whether the offer has value as an extension of credit alone." 434 F.3d at 955. An offer will have value to a consumer "if it is useful to the *normal* consumer." *Id.* To determine whether a lender has made a firm offer in compliance with the FCRA, "a court need only determine whether the four corners of the

14

offer satisfy the statutory definition . . . and whether the terms are honored when a consumer accepts." *Id.* at 956.

In *Hernandez v. Chase Bank USA, N.A.*, 429 F. Supp.2d 983 (N.D. Ill. 2006), the court applied *Murray* and found no firm offer in a mailing stating that the recipient had been "pre-qualified for up to $100,000 or more" in a home-equity loan. The mailing stated:

> This offer is for a secured loan only, and your residence is the collateral for the loan. Our Lending Specialists will help you determine the type of loan that best suits your needs, and the maximum loan you are eligible for, and confirm your pre-qualified status. Afterward, you must complete an application, comply with all of our loan program requirements and pay all applicable loan fees. . . . We may withdraw our offer entirely if updated information we receive from a credit bureau, during the loan structuring process, or in your application shows that you do not meet all of our loan program requirements. We may also withdraw this offer if you move outside our marketing area, or if you do not have sufficient income to repay the new obligation, or your minimum loan amount is less than $15,000 (or $10,000 in MI).

*Id.* at 985. The mailing also stated that "[p]rogram terms and conditions are subject to change without notice," "[n]ot all products are available in all states or for all loan amounts," and "[o]ther restrictions and conditions may apply." *Id.* at 986. Applying the standards set out in the Seventh Circuit cases, the district court held that the terms of the loan disclosed in the mailing were too vague and indeterminate to allow a consumer to conclude that the offer had value. *Id.* at 988. Any loan depended on information to be provided by the consumer, and the loan terms could be changed without notice. *Id.*

In *Hyde v. RDA, Inc.*, 389 F. Supp. 2d 658, 661 (D. Md. 2005), the court followed the Seventh Circuit cases.   In *Hyde*, the plaintiff received a promotional flyer from a car dealership.   The flyer stated that the plaintiff was preapproved to receive a loan of up to $25,000 toward the purchase of an automobile.   The flyer stated the following conditions:

> Your new vehicle payment cannot exceed 20% of your gross monthly income; vehicle payment totaled with your current monthly payments must not exceed 50% of your gross income. Must be at least 18 years of age.  If you accept this offer, we may not extend credit to you if, after you respond, we determine that you do not continue to meet the criteria used for this pre-approved offer.  Lender assumes no responsibility for incorrect information supplied by various credit reporting agencies.  Any equity deficit in your current vehicle must be paid or refinanced with new vehicle.  Credit severity may affect down payment. Bankruptcies must be discharged.  If in compliance with provisions listed above, you are guaranteed to receive a loan for minimum of $300 up to $22,500 toward the purchase of a 1999 or newer vehicle from Enterprise America Finance.

*Id.* The flyer further stated that the defendant "used information in a pre-qualifying report from a credit agency in connection with this firm offer of credit."  *Id.*

After receiving the flyer, the plaintiff went to the dealership to accept the defendant's financing offer and purchase a vehicle.  Following the purchase, a dispute arose and the plaintiff filed suit, alleging FCRA violations.  The defendant moved to dismiss the plaintiff's claim that the flyer was not a "firm offer of credit."  The district court applied the Seventh Circuit test, requiring a court to consider the entire offer and all material conditions included in it.  *Id.* at 666.  Expressing doubt as to whether the guaranteed offer of "at least" $300 would provide any value to a consumer buying a vehicle and emphasizing that the flyer

16

lacked information about the interest rate and repayment period, the *Hyde* court denied the motion to dismiss.  *Id*. at 666–67.

In a footnote, the *Hyde* court distinguished the Fifth Circuit's holding in *Kennedy v. Chase Manhattan Bank USA, NA*.  *Id.* at 666 n.3.  The *Hyde* court noted that *Kennedy* addressed whether an offer conditioned on the consumer meeting  previously established criteria could be a "firm offer" under the FCRA.  In *Hyde*, by contrast, the issue was whether the offer was firm for reasons unrelated to whether it was conditional.  Other courts have found different guidance in the Fifth Circuit's decision in *Kennedy*, as discussed below.

### b.    The "Strict Constructionist" Approach

A number of cases have declined to follow the Seventh Circuit's approach.  These cases use an approach similar to that taken by the Fifth Circuit in *Kennedy v. Chase Manhattan Bank USA, NA*, 369 F.3d 833.  In *Kennedy*, the court analyzed whether a creditor may impose criteria for credit in addition to those stated in the offer, which the consumer must meet before credit is actually extended.  The plaintiffs in *Kennedy* received a mailing stating that they had been preapproved to receive the defendants' credit card.  When the plaintiffs returned the credit card applications, the defendants declined to open the accounts because, based on information from credit reports, the plaintiffs did not meet preestablished criteria not stated in the mailing.  The Fifth Circuit found that the FCRA permitted a creditor to make a "conditional" firm offer of credit.  As a result, the defendants did not violate the FCRA in conditioning their offer on the satisfaction of certain criteria.  *Id.* at 841.  The court held that under the FRCA, "a firm offer of credit really under the Act really means a 'firm

17

offer if you meet certain criteria.'"  *Id.* (internal quotations omitted).

In *Kennedy*, the court was not asked to determine what specific or detailed information had to be stated in a mailing to make it a "firm offer."  For that reason, the *Hyde* court found *Kennedy* distinguishable.  But other courts have applied *Kennedy*'s approach to the FCRA in addressing the issue of what information must be in a mailing to make it a "firm offer of credit."  In *Putkowski v. Irwin Home Equity Corp.*, 423 F. Supp. 2d 1053 (N.D. Cal. 2006), the district court declined to read the FCRA to require that a mailing must specify the material credit terms so as to enable the recipient to determine from the "four corners" of the mailing whether the credit offered had "value."  The mailing at issue in *Putkowski* offered a revolving line of home-equity credit ranging from $15,000 to $300,000 for a twenty-year term, with a maximum interest rate of 24%.  The mailing stated that a borrower might be eligible to receive more favorable credit terms and set out the method by which the interest rates would be calculated.  *Id.* at 1057.  The court did not examine whether the plaintiff took any action to obtain credit after receiving the mailing.  The *Putkowski* court declined to adopt the Seventh Circuit's approach and granted the defendants' motion to dismiss.  The court rejected the argument that the offer was insufficiently detailed or specific to enable the recipient to determine that it had "value" to a consumer.  "The text of the FCRA does not support plaintiffs' suggestion that a firm offer of credit cannot contain a range of credit or interest rates, or that it must be of sufficient 'value' when judged by a later arbiter, as suggested by the Seventh Circuit in *Cole*."  *Id.* at 1060.

In *Poehl v. Countrywide Home Loans, Inc.*, 464 F. Supp. 2d 882 (E.D. Mo. 2006), the

district court examined a mailing relating to a home loan.   The mailing stated, "Congratulations!  You've been pre-selected for $92,500 from Homeowners Loan Corp. Call . . . and use this money, upon final approval, to do whatever you want." *Id.* at 883.  The mailing did not specify the interest rate, repayment period, or other loan terms.  The mailing did state that the offer was conditioned on the "re-verification of your credit information used in making you this offer, the satisfaction of Homeowners Loan Corp.'s other credit, income, and collateral requirements. . . . Actual loan amount may be more or less." *Id.*   The court analyzed the cases and decided not to follow the Seventh Circuit's approach of requiring a mailing to include information not specifically required by the FCRA in order to qualify as a "firm offer of credit."  The court granted the defendants' motion to dismiss the FCRA claim, finding that as a matter of law the mailing was a "firm offer of credit."  The court concluded that a firm offer did not have to state the material terms of a loan to comply with the FCRA:

> It is not the Court's job to decide whether accepting a particular offer might be unwise.  Rather, I need only look to whether the offer has some value, or more than nominal value, in order to distinguish it from a sales pitch.  Congress carefully crafted its definition of "firm offer" and chose not to require that the lender specify particular loan terms.  Instead, Congress provided a number of "outs" for a lender, including additional pre-selection criteria, verification, and collateral requirements.  If Congress had wanted to require that loan amounts, interest rates, or payback times be specified in a "firm offer," it could have done so.  So long as the statutory criteria are met, and so long as there is some value to the consumer so that the offer is not a sham or mere solicitation, then the absence of interest rates and other terms does not prevent the offer from being a "firm offer of credit."

*Id.* at 886.

In *Klutho v. Shenandoah Valley National Bank*, No. 4:06-CV-1317, 2007 WL 1527074 (E.D. Mo. May 22, 2007), the district court adopted *Poehl*'s reasoning and held that the defendant's promotional letters for a home-equity line of credit contained "firm offers." The letters stated that the recipient was eligible for a minimum loan amount of $25,000.  The letters did not include information about the loan amount for which the plaintiff was eligible, the interest rates for the loan, the repayment period, or how the interest would be determined. In granting the defendant's motion to dismiss, the court stated, "[n]one of these terms . . . however, are required in order to determine whether the letter qualifies as a 'firm offer of credit' under the FCRA."  *Id.* at *2.  "A reasonable consumer viewing these mailers would believe that they contain some value, the minimum amount of credit to be extended.  Thus, even absent a *specific* amount of money, the consumer can determine from these letters that if all other conditions are met, the consumer will be extended a minimum of $25,000.00." *Id.* at *3.

The district court in *Phinn v. Capital One Auto Finance, Inc.*, No. 07-CV-10940, 2007 WL 1675282 (E.D. Mich. June 11, 2007), also declined to adopt the Seventh Circuit's approach that the FCRA requires specific material terms to be included in a credit offer.  The solicitation in that case was for a loan toward the purchase of an automobile.  The mailing stated that the consumer had to meet certain criteria before the loan would be extended, but that if the criteria were met, the loan amount would be between $10,000 and $25,000.  The mailing contained the following disclosures:

> The consumer cannot be in bankruptcy, must be at least 18 years of age and have a monthly income of at least $1,500; the total amount financed must be at least $10,000; the consumer may need to trade in a current vehicle to close an existing loan; the offer is not valid for Daewoo, Oldsmobile, Kia, Suzuki and discontinued vehicle lines. . . . This offer is not guaranteed if you do not meet our criteria, including providing acceptable property as collateral.

*Id.* at *3.

The plaintiff in *Phinn* contended that the offer was not "firm" because it lacked essential terms, such as the interest rate and repayment terms. The district court observed that the FCRA does not require that all the material terms be included in the offer. The record contained no evidence that the defendant would not honor the offer stated in the mailing. "Here, there is no dispute that the mailer extended Plaintiff an offer of credit between $10,000 and $25,000, provided that Plaintiff meet additional criteria. Under the plain language of the FCRA, this is all that is required to constitute a 'firm offer of credit.'" *Id.* at *3. Other courts have made similar statements. *See, e.g.*, *Nasca v. J.P. Morgan Chase Bank, N.A.*, No. 06-CV-3472, 2007 WL 678407, at *4 (S.D.N.Y. Mar. 5, 2007) ("This Court, however, is loathe to import a requirement into a statutory definition that was not placed there by Congress. If Congress believes the statutory definition of 'firm offer of credit' does not adequately protect a consumer's interest in the privacy of her credit information, it is for Congress to act; it is not for the judiciary to add requirements that do not exist in the statute.").

In *Pearson v. Novastar Home Mortgage, Inc.*, No. 05-1377, 2006 U.S. Dist. Lexis

36282 (M.D. La. Mar. 28, 2006), the court considered whether a communication stating that the addressee was preapproved for a $55,000 loan was a "firm offer."  The communication stated:

> Rates, terms and loan amounts are estimates only and may vary on each loan and are subject to change.  This is not a commitment to lend money.  Actual amount of credit may vary. Information contained in your credit file was used in preparing this offer.  Amount represents what you may be able to receive to consolidate bills, make home improvements, or get cash; your actual loan amount may vary.

*Id.* at *2–3.  The plaintiff contended that because the communication did not include the interest rate, the method for computing interest, or the repayment period, it did not extend a "firm offer of credit."  The court rejected this argument, which was based on *Cole*.  The court reasoned that the FCRA's definition of "firm offer" as "any offer of credit . . . that will be honored if the consumer is determined . . . to meet the specific criteria used to select the consumer for the offer" and that the absence of Fifth Circuit authority adopting the *Cole* standard cautioned against inserting requirements into the FCRA.   *Id.* at *14–15. Nevertheless, the court denied the defendant's motion to dismiss because the record lacked evidence as to the criteria used to determine whether the offer would in fact be extended.  *Id.* at *15–16.  The court also observed that "although Novastar was apparently making the offer, the document also states that 'Novastar Home Mortgage is not a lender.'  Therefore, it is not clear based on the pleadings that the offer could have been honored by Novastar, the ostensible lender, as required by the Act."  *Id.* at *16.

### 3.    *Analysis of the Competing Lines of Case Law*

22

Villagran urges this court to adopt the Seventh Circuit's approach and require a determination from the "four corners" of the mailing that the credit offer is "of value" to the consumer.  This determination requires the mailing to state, and the court to consider, the amount and material terms of the credit offered, including interest rates and repayment periods.  Villagran distinguishes *Kennedy* on the basis that it addressed "facts attendant to a creditor's withdrawal of an offer after the consumer attempted to accept it," rather than whether the mailing extended a firm offer of credit.  (Docket Entry No. 69).

Villagran overstates the difference between the issue in *Kennedy* and the issues before this court.  Although *Kennedy* did not address the specific issue before this court, the opinion does provide guidance on the approach the Fifth Circuit took in interpreting the FCRA.  The *Kennedy* court did examine the text of the FCRA and how it defined a "firm offer of credit" and declined to expand on the specific requirements of the FCRA in concluding that the FCRA permits creditors to make "firm" offers of credit that are "conditioned on the consumer meeting the creditor's previously-established criteria for extending credit." *Kennedy*, 369 F.3d at 841.  Similarly, the courts rejecting the Seventh Circuit's approach in *Cole*, *Perry*, and *Murray* have declined to expand on the specific requirements of the FCRA to add to the required contents of a mailing.  *See, e.g., Gelman v. State Farm Mut. Auto Ins. Co.*, No. 06-5118, 2007 WL 2306578, at *6 (E.D.Pa. Aug. 9, 2007) (finding that the "substantial value" test "simply has no basis in the statutory text"); *Gross v. Wash. Mut., Inc.*, No. 06 Civ. 4340(RLC), 2007 WL 1404435, at *3 (S.D.N.Y. May 10, 2007) (finding that the "substantial value" test "find[s] no support within the text of the FCRA"); *Putkowski*, 423

F.Supp.2d at 1060 ("The text of the FCRA does not support plaintiffs' suggestion that a firm offer . . . must be of sufficient 'value' when judged by a later arbiter, as suggested by the Seventh Circuit in *Cole*.").  This approach is consistent with the guidance *Kennedy* provides for interpreting and applying the FCRA.

Disclosure of the exact terms of an auto loan during the preapproval and solicitation process is not only beyond what the FCRA requires, it may be an unrealistic standard.  The specific terms of a given loan offer may vary greatly depending on what level of risk a particular customer presents, taking into account each individual's credit score, income, and equity holding in the collateral used to secure that loan.  As a witness knowledgeable about such credit-mailers testified, "a customer came in who made 1,500 bucks a month, no lender in the world is going to put them in no matter what their credit score is or what their credit is like.  No lender in the world is going to put them in a $75,000 vehicle.  They don't have the capacity to pay it back."  (Docket Entry No. 65, Ex. E at 78:24–79:4).  Because "the specific terms of the loan may vary depending on the exact amount borrowed, the type of car purchased, the consumer's current income, and the duration of the loan," requiring an offer to contain more specific information would upset the balance struck by the FCRA between consumer privacy and a business's right to advertise.  *Phinn*, 2007 WL 1675282, at *4; *see also Soroka v. Homeowners Loan Corp.*, No. 8:05-CV-2029, 2006 WL 4031347, at *4 (M.D. Fla. June 12, 2006) ("Every consumer and every lender has a common understanding that home loans are made for a definite period of time, that banks charge interest for lending money, and that interest rates are subject to change.  Lenders charge the highest rate that the

24

market will bear, and consumers obtain the lowest rate justified by their credit information, which involves an assessment of risk as to that individual consumer by the lender. The value of the property which secures the loan is another critical piece of information as to the amount of the loan that may be extended. This mutual understanding is inherent in the lending process . . . .").

Neither the FCRA nor the Fifth Circuit's interpretation of the Act requires that an offer include specific information as to interest rates, repayment period, or similar terms, to enable a consumer to determine whether the offer is of "some value" based on the four corners of the mailing. The Act requires that the defendant make an offer of credit that will be honored if the consumer meets the preestablished criteria. *See Kennedy*, 369 F.3d at 841 (finding that "the Act permits a creditor to make a 'conditional' firm offer of credit"). Villagran has failed to offer a persuasive argument as to why this court should add to the requirements stated in the FRCA, to "import a requirement into a statutory definition that was not placed there by Congress." *Nasca*, No. 06-CV-3472, 2007 WL 678407, at *4. The approach taken by courts rejecting the Seventh Circuit cases is consistent with the FCRA and with the Fifth Circuit guidance on interpreting that Act.

### D.    The Mailing Sent to Villagran

The defendants' mailing to Villagran stated that she had been preapproved for a $27,525 loan toward the purchase of an automobile. The mailing stated that "[i]nformation from a consumer credit profile was used in conjunction with this offer. This offer has been extended because criteria have been satisfied for the offer. This offer may not be extended

if after responding to this offer you do not meet the criteria used in this selection process. Furthermore we must verify income and employment, review recipient's and spouse's credit and analyze equity position in collateral prior to final loan approval." (Docket Entry No. 65, Ex. A).

Under *Kennedy*, the fact that the credit offer was conditioned on Villagran meeting certain criteria establishing creditworthiness does not make the offer "unfirm." The FCRA provides that a credit offer may be conditioned on the consumer's meeting certain pre-established criteria bearing on creditworthiness, on the verification of the criteria used to preselect the recipient, and on the consumer satisfying certain debt-to-equity criteria in collateral used to secure the loan. 15 U.S.C. § 1681a(l); *see also Kennedy*, 369 F.3d at 841 ("[A] firm offer of credit under the Act really means a 'firm offer if you meet certain criteria.'") (internal quotations omitted). The mailing Villagran received is not "unfirm" because it was conditioned on her meeting certain criteria.

Villagran argues that the mailing she received lacks specific information necessary to make it a "firm offer." Villagran argues that the mailing stated that she was preapproved for a $27,525 auto loan but provided no information about the loan's interest rate, the repayment period, the method by which the interest would be compounded, or whether penalties would be incurred for late payment. Villagran urges this court to adopt the Seventh Circuit's approach and require that to be "firm," an offer must provide the loan's material terms, such as interest rates and repayment periods. As analyzed above, however, the FCRA does not require that such terms be included in a mailing to make it a "firm offer." Under

26

the approach taken by the Fifth Circuit in *Kennedy* and a number of district courts, the FCRA requirements should not be added to or expanded by the courts. The FCRA states that the defendant may use preestablished criteria to make an offer of credit based on information obtained from a consumer's credit report, but must honor the offer if the consumer meets the criteria. The FCRA does not require an offer to spell out interest rates, repayment period, or other terms that affect the "value" of the offer to consumers.

The offer Villagran received stated that she was prequalified to participate in Freeway Ford's "Guaranteed Approval Event," and that if she met certain criteria, she would receive $27,525 in credit to purchase a car. The mailing stated that she "may not" receive the loan if the selection criteria were not met. The mailing stated that if certain conditions were met, Villagran would receive a loan of $27,525. The record does not show that Villagran took action to accept the loan offer. Nor is there evidence that Freeway Ford failed to honor the loan offered to her or any other customer meeting the criteria. Villagran's argument that on its face the mailing is not a "firm offer" fails.

Unlike many of the cases in which courts found issues as to an offer's "firmness," the defendants here have introduced competent summary judgment evidence of the criteria they used to preselect individuals to receive the offer. Freeway Ford hired AIM Data to develop the mailing sent to Villagran. Larry Bruce, AIM Data's owner, testified in his deposition that the mailings were sent to individuals with credit scores between 500 and 599, who had at least 60% equity in a vehicle, had no pending bankruptcies, and no repossessions in their credit history. (Docket Entry No. 66, Ex. A at 47:2–49:17). The mailing disclosed that the

loan offer was subject to employment verification, a credit review of both the customer and his or her spouse, and a review of the equity held in the collateral.  (Docket Entry No. 65, Ex. A).

Villagran argues that Stephen Prather's deposition testimony raises a fact issue as to whether Freeway Ford would honor the offer stated in the mailing.  When asked how Freeway Ford would finance the loans, Prather testified that the company customarily obtained financing through a third-party lender.  (Docket Entry No. 69, Ex. C at 46:5–14).  Prather testified that Freeway Ford had the ability to finance the loans directly, depending on the circumstances.  (*Id.* at 46:15–49:23).  If a customer wanted to finance the purchase of a car and the customer met Freeway Ford's credit criteria, then Freeway Ford would be able to obtain financing on behalf of that customer.  Villagran does not explain why it makes a difference under the FCRA whether the financing come from a third party or directly from Freeway Ford.  Nor does Villagran explain why it makes a difference whether Freeway Ford had the ability to obtain financing itself for all the customers to whom it extended the credit offer or whether Freeway Ford used a third party to provide the financing.  The evidence in the record shows that those consumers who received the mailing Villagran was sent, who took the steps to obtain the credit offered and who met the selection criteria, received the loans.  Speculation that Freeway Ford would be unable to obtain direct (as opposed to third-party) financing for customers to whom it sent a mailing does not create a fact issue as to

whether the credit offer was "firm."  The mailing itself does not establish that it was not a "firm offer of credit," as Villagran contends in moving for partial summary judgment.

The record does not raise a fact issue as to whether defendants honored the credit offered to Villagran and others receiving the same mailing she did.  *See Dixon v. Shamrock Fin. Corp.*, 482 F. Supp. 2d 172, 177 (D. Mass. 2007) ("[N]o allegation is made in the Complaint that [the plaintiff]—or anyone else—had ever responded to [the defendant's] solicitation and then been denied credit despite meeting creditworthiness requirements or had been diverted to some other type of business dealing.").  The summary judgment record shows that defendants' mailing to Villagran constituted a "firm offer of credit" under the FCRA.  This court grants defendants' motion for summary judgment and denies Villagran's motion, dismissing the claim as to the mailing sent to Villagran.

### E.    The Other Mailings

Villagran also argues that the three other mailings the defendants sent, although not to her, also fail to make firm offers of credit.  She has moved for partial summary judgment that these mailings violate the FCRA as well.

Villagran did not receive these other three mailings.  The defendants did not use information obtained from accessing her credit report in generating the mailings.  A threshold issue is Villagran's ability as an individual plaintiff to challenge these additional mailings.

Villagran has not shown how the mailings the defendants sent to other consumers using their credit report information has caused harm to her.  Nor has she cited a provision in the FCRA that provides a basis for one consumer to recover damages because another

consumer's credit report was accessed for a purpose not permitted under the FCRA.  The FCRA cases involve consumers suing to recover damages for unlawful activity regarding their own credit information.  *See, e.g., Kennedy v. Chase Manhattan Bank USA, NA* 369 F.3d 833 (5th Cir. 2004); *Wilting v. Progressive County Mut. Ins. Co.*, 227 F.3d 474 (5th Cir. 2000).  If Villagran asserts a right to recover damages herself for mailings sent to other consumers using their credit information, she has not identified a statutory basis for doing so.  Such a right would be at odds with case law in the Fifth Circuit applying other provisions of the FCRA.  These cases hold that a plaintiff must show injury to have standing to assert a claim under the FCRA based on improper disclosure and use of credit information.  *See Washington v. CSC Credit Servs. Inc.*, 199 F.3d 263, 267 (5th Cir. 2000) ("[T]he actionable harm the FCRA envisions is improper disclosure, not the mere *risk* of improper disclosure that arises when 'reasonable procedures' are not followed and disclosures are made [as a result].").  The Fifth Circuit held in *Washington* that a plaintiff asserting a violation of section 1681b must show an actual disclosure of her credit information before that plaintiff could sue the credit reporting agency for failing to maintain reasonable procedures under section 1681e to limit the disclosure of credit information.  *Id.*  The appellate court found that the district court erred in finding that the plaintiff had standing without requiring such a showing of harm.  Since *Washington*, two district court cases have interpreted the Fifth Circuit's holding as requiring that the plaintiff "prove some cognizable FCRA violation" to assert claims for damages under the Act.  *Kennedy v. Victoria's Secret Stores, Inc.*, No. Civ.A. 03-2691, 2004 WL 414808, at *2 (E.D.La. Mar. 3, 2004) (a husband sued under the FCRA and alleged a

number of violations as to his wife's credit report; the court stated that the husband had "failed to set forth any allegations that would state a claim upon which relief may be granted . . . because he has failed to assert any damages he suffered as a result of [a credit reporting agency's] actions relating to his wife's credit report"); *Washington v. CSC Credit Servs., Inc.*, 194 F.R.D. 244, 254 (E.D. La. 2000) (finding that a wife lacked standing to challenge the procedures used to protect against disclosure of her husband's credit report "without first demonstrating some damage to her own credit worthiness"). Because Villagran has also asserted violations of the FCRA as to the other mailings as a class representative, this court examines Villagran's motion for partial summary judgment that the mailings are not "firm offers of credit" as a matter of law.

The three other mailings did not offer the same credit incentives as the mailing sent to Villagran but were similar in content. One offered "$0 down and low monthly payments," "0.0% for 60 months," and various additional rebates, incentives, and discounts (Docket Entry No. 65, Ex. B). Another offered "up to $29,500 Pre-Approval" towards the purchase of a vehicle. (*Id.*, Ex. C). The last offered two car payments for a new vehicle made by Ford and "up to $18,000, direct from Ford." (*Id.*, Ex. D). Fine print at the bottom of all the mailings qualified the incentives made in the main text. The offer of 0% financing, for example, was limited to "select vehicles with approved credit." (*Id.*, Ex. B). All the mailings included the same disclaimer language as the mailing sent to Villagran:

> You must present this notice to Freeway Ford upon arrival. Information from a consumer credit profile was used in conjunction with this offer. This offer has been extended

31

> because criteria have been satisfied for the offer.  This offer may
> not be extended if after responding to this offer you do not meet
> the criteria used in this selection process.  Furthermore we must
> verify income and employment, review recipient and spouse's
> credit and analyze equity position in collateral prior to final loan
> approval.  You have the right to prohibit recipient's credit
> profile from being used for similar prescreened offers by
> requesting by telephone to Experian at 1-888-567-8688.

(*Id.*, Exs. B, C, D).

Like the mailing Villagran did receive, none of the three mailings sent to others provided specific details about the offers of credit made by Freeway Ford.  Villagran's argument that this lack of detailed information causes the mailings to violate the FCRA fails. An offer of credit does not need to provide specific information of the material terms to be a "firm offer."  Rather, the court must examine whether the mailings satisfy the FCRA's requirements.  *See Kennedy*, 369 F.3d at 839–42; *see also Putkowski*, 423 F.Supp.2d at 1060 ("The text of the FCRA does not support plaintiffs' suggestion that a firm offer of credit cannot contain a range of credit or interest rates, or that it must be of sufficient 'value' when judged by a later arbiter, as suggested by the Seventh Circuit in *Cole*.").

The FCRA defines a "firm offer" as one that "will be honored if the consumer is determined, based on information in a consumer report on the consumer, to meet the specific criteria used to select the consumer for the offer."  15 U.S.C. § 1681a(l).  A creditor may make such a "firm" offer subject to a number of conditions, such as a determination that the consumer meets certain pre-established criteria bearing on credit worthiness; verification that the consumer continues to meet those criteria; and verification of the information in the

consumer's application for the credit.  15 U.S.C. 1681a(1); *see also Kennedy*, 369 F.3d at 841 ("[T]he Act permits a creditor to make a 'conditional' firm offer of credit," so that "a firm offer of credit under the Act really means a 'firm offer if you meet certain criteria.'") (internal quotations omitted).

In the fine print, Freeway Ford does expressly condition each of the three offers of credit on the recipient meeting the certain selection and eligibility criteria.  The FCRA allows such conditional firm offers, but only if the criteria are established before the selection of the consumer for the offer and if the criteria are established for the purpose of determining whether to extend credit under the offer.  15 U.S.C. § 1681a(l)(1)(A)–(B).  Because there is no evidence of the criteria Freeway Ford used to select consumers, or of when the criteria were established, the record does not establish that the three additional mailings constituted firm offers under the FCRA.  However, Freeway Ford's failure to specify the essential terms of the offer, such as the rate of interest charged and the method for computing interest, does not make the mailings "unfirm," as Villagran argues in her motion for partial summary judgment.  Villagran's motion for partial summary judgment, that the other three mailings violate the FCRA as a matter of law, is denied.

## III.    The Defendants' Motion for Summary Judgment on Wilfulness

Villagran alleges that the defendants willfully violated the FCRA.  This court has determined that the defendants' mailing to Villagran was a "firm offer of credit," as that term is defined under the FCRA.  Because the defendants' mailing to Villagran was a "firm offer," they are not liable under the FCRA and this court need not address whether there is a fact

33

issue as to willfulness.

The defendants submitted the affidavit of Stephen E. Prather in support of their contention that there is no evidence that any violation of the FCRA was done willfully. (Docket Entry No. 66, Ex. A).  Villagran moves to strike Prather's affidavit as conclusory. (Docket Entry No. 70).  The motion to strike is also denied.

On July 20, 2007, Villagran moved to redepose Stephen Prather following the Supreme Court's June 4, 2007 decision in *Safeco Insurance Co. of America v. Burr*, 127 S. Ct. 2201 (2007), which defined "willful" under the FCRA.  (Docket Entry No. 84).  Because this court has determined that the defendants' mailings make firm offers of credit and are not liable under the FCRA, the motion is denied as moot.

## IV.    Villagran's Motion for Class Certification

A suit pleaded as a class action may be resolved by deciding a motion to dismiss or for summary judgment, even before class certification is decided.  *Pisciotta v. Old National Bancorp.,*---F.3d----(2007), 2007 WL 2389770 (7th Cir. August 23, 2007);  *Floyd v. Bowen,* 833 F.2d 529, 534 (5th Cir. 1987); *see also Curtin v. United Airlines, Inc.*, 275 F.3d 88, 93 (D.C. Cir. 2001) ("[W]here the merits of the plaintiffs' claims can be readily resolved on summary judgment, where the defendant seeks an early disposition of those claims, and where the plaintiffs are not prejudiced thereby, a district court does not abuse its discretion by resolving the merits before considering the question of class certification."); *Garcia v. Veneman*, 211 F.R.D. 15, 19 n.2 (D.D.C. 2002) ("A court may certainly decide dispositive motions prior to determining whether the case may be maintained as a class action.").  The

effect of granting a motion for summary judgment in favor of the defendants is to "disqualif[y] the named plaintiffs as proper class representatives" and "to moot the question whether to certify the suit as a class action unless the lawyers for the class manage to find another representative." *Cowen v. Bank United of Texas, FSB*, 70 F.3d 937, 941 (7th Cir. 1995); *see also Garcia*, 211 F.R.D. at 19 n.2 ("Once the court disposes of a claim, the court need not consider the disposed-of claim as a basis for class certification.").

Because the defendants' summary judgment motion that the mailing Villagran received does not violate the FCRA is granted and Villagran's motion for partial summary judgment as to all the mailings she challenged is denied, Villagran's motion for class certification under Rule 23(b)(3) is moot. In the interest of complete analysis, however, it is worth noting other issues raised by Villagran's class certification motion.

Villagran is seeking certification under Rule 23(b)(3), which requires her to show that the proposed class meets the requirements of Rule 23(a)[5] and of Rule 23(b)(3).[6] *Washington*

---

[5] Rule 23(a) states:

> **(a) Prerequisites to a Class Action**. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV. P. 23(a).

[6] Rule 23(b) states:

> **(b) Class Actions Maintainable.** An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition: ... (3) the

35

*v. CSC Credit Servs. Inc.*, 199 F.3d 263, 265 (5th Cir. 2000).  One of the four requirements

of Rule 23(a) is typicality, which requires a showing that "the claims or defenses of the

representative parties are typical of the claims or defenses of the class." FED. R. CIV. P.

23(a)(3).  Typicality does not require identity of claims but does require that "the class

representative's claims have the same essential characteristics of those of the putative class.

If the claims arise from a similar course of conduct and share the same legal theory, factual

differences will not defeat typicality." *James v. City of Dallas, Tex.*, 254 F.3d 551, 571 (5th

Cir. 2001).  Villagran has not shown how her claim, based on the one mailing she received

using information from her credit report, is typical of the claims of class members who

received different mailings.  Villagran has not cited cases that would support certifying a

class that includes members who received mailings that she as the named plaintiff did not

receive and that did not involve accessing her credit report.  Most courts applying the class

---

> court finds that the questions of law or fact common
> to the members of the class predominate over any
> questions affecting only individual members, and that
> a class action is superior to other available methods
> for the fair and efficient adjudication of the
> controversy. The matters pertinent to the findings
> include: (A) the interest of members of the class in
> individually controlling the prosecution or defense of
> separate actions; (B) the extent and nature of any
> litigation concerning the controversy already
> commenced by or against members of the class; (C)
> the desirability or undesirability of concentrating the
> litigation of the claims in the particular forum; (D) the
> difficulties likely to be encountered in the
> management of a class action.

FED. R. CIV. P. 23(b).

certification requirements of Rule 23(a) in similar contexts have found the typicality requirement satisfied based on the class representative's receipt of the same mailing as the putative class members. *See, e.g., Bernal v. Keybank, N.A.*, No. 06-C-8, 2007 WL 2050405, at *1 (E.D. Wis. July 11, 2007) (granting plaintiff's motion to certify a class consisting of persons who received a specific solicitation); *Shellman v. Countrywide Home Loans, Inc.*, No. 1:05-CV-234-TS, 2007 WL 1100795, at *1 (N.D. Ind. Apr.12, 2007) (stating that the plaintiff's claim "is based on a mailer she and at least 1,000 other consumers in Indiana received"); *Forrest v. Shenandoah Valley Nat. Park*, 2007 WL 1029503, at *1 (E.D. Wis. Mar. 28, 2007) (the plaintiff sought to certify a class composed of "all persons with Wisconsin addresses to whom the Bank has sent solicitations in the form of Exhibit A"); *Krey v. Castle Motor Sales, Inc.*, 241 F.R.D. 608, 615 (N.D. Ill. 2007) (finding typicality based on the fact that "all parties . . . were sent the mailer of Exhibit A").

Villagran asserts that her claim is typical of the proposed class because "each class member's claim arises from the same course of conduct—Defendant's sending or causing to be sent the 'offers' to members of the class." (Docket Entry No. 78).  The record does not show whether the defendants used the same set of criteria to create the recipient list for each mailing.  There is no evidence of any criteria that the defendants used to preselect consumers for the mailings that Villagran did not receive.  The other mailings that Villagran seeks to challenge have different terms and offer different incentives to the recipients.  The motion to certify does not appear to provide the necessary showing that Villagran's claim is typical of those who received different offers than she did, and therefore she has not demonstrated

37

that she would be a proper representative of such class members.  *See In re Trans Union Corp. Privacy Litigation*, 211 F.R.D. 328, 337 (N.D. Ill. 2002) (finding that the plaintiff "alleges only that she received a solicitation from MCI [one creditor]," but "does not allege that she received a firm offer (or solicitation) from any other [creditor]," such that "apart from [plaintiff's] claim relating to MCI" the plaintiff had no standing to represent a class composed of "all persons in the United States . . . whose private financial credit . . . information has been disclosed by [a credit reporting agency]. . . and to whom [an] offer [of credit] was made").

This typicality issue could be addressed by subclassing.  But another problem with certifying the proposed class is Villagran's inability to obtain or recreate the list of those who were sent any of the mailings.  Villagran's discovery efforts have shown that the lists of names and addresses used to send the mailings no longer exist and cannot be recreated.  The record shows that after a creditor has generated a list of recipients and created a mailing, it is the standard policy of the companies involved in the process, from the credit reporting agency that provided the consumer information to the printing company that produced the mailings, to destroy the records relating to the mailing recipients; the justification proffered is the protection of the recipients' privacy.  Whatever the reason for the policy of destroying the lists, the upshot is that the lists of individuals who were sent the mailings by the defendants in 2005 no longer exist.  Because the credit ratings of individuals change on a daily basis, it is apparently not feasible to recreate, in whole or in significant part, the lists the defendants used in sending the mailings at issue.  While Villagran has obtained

information about the number of mailings sent out, she has been able to learn the identities of only a few of the thousands who were sent the mailings.  Villagran's inability to obtain or recreate the mailing lists raises doubt as to whether she can ever identify the members of the proposed class, which in turn raises concern as to whether she can provide effective notice to those class members or whether she can distribute the damages she seeks on their behalf.

A party seeking to certify a Rule 23(b)(3) damages class must show "that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  FED. R. CIV. P. 23(b)(3).  In making the superiority inquiry, a court considers "the difficulties likely to be encountered in the management of a class action."  *Id.*  An inability to identify the overwhelming majority of the members of a proposed class through any means raises significant superiority and manageability problems.

Villagran argues that problems with providing notice should not be considered at the certification stage.  Whether effective notice can be provided is properly part of the certification analysis.  *See Murray v. GMAC Mortgage Corp.*, No. 05 C 1229, 2007 WL 2317194, at *7 (N.D. Ill. July 23, 2007) (decertifying a class similar to the one Villagran seeks to certify based on the parties' inability to identify the class members and provide effective notice).  In addition to being required by the text of Rule 23, the notice requirement for (b)(3) classes has a constitutional dimension.  *See In re Monumental Life Ins. Co.*, 365 F.3d 408, 416 (5th Cir. 2004) ("As 'fundamental requisites of the constitutional guarantees of procedural due process,' notice and opt-out are mandatory for damage classes certified

39

under rule 23(b)(3).") (internal citation omitted).

Villagran correctly argues that publication notice can be an adequate substitute for individual notice when the information necessary to identify class members and provide individual notice is simply unavailable.  Courts have found that publication notice can satisfy Rule 23.  *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 617 (U.S. 1997) ("Rule 23 instructs the court to 'direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort.'"); *In Re Warfarin Sodium Antitrust* Litigation, 391 F.3d 516, 536 (3rd Cir. 2004) (holding that the district court acted within its discretion in finding that "the best notice practicable under the circumstances" was publication notice in publications likely to be read by consumer claimants along with a call-center and a website with information and downloadable forms); *In re Nissan Motor Corp. Antitrust Litigation*, 552 F.2d 1088, 1097 (5th Cir. 1977) ("[B]ecause constructive notice has long been recognized as a poor substitute for actual notice and its justification is difficult at best, it is to be used only when circumstances make it impracticable to gain the names and addresses of class members and notify them individually of the action's pendency.") (internal citations and quotations omitted); *see also In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 107–08 (S.D.N.Y. 2007) ("[W]hen class members' names and addresses may not be ascertained by reasonable effort, publication notice has been deemed adequate to satisfy due process."); *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 296 (W.D. Tex 2007) ("While sending notice by mail is preferred when all or most of the class members can be identified, where class members cannot be

identified, as here, notice by publication is sufficient."); 288 *Manual for Complex Litigation*, § 21.311 (4th. ed. 2004) ("Publication in magazines, newspapers, or trade journals may be necessary if class members are not identifiable after reasonable effort.").

However, courts have approved publication and other forms of constructive notice only if they are reasonably likely to be effective. *See, e.g., In re Holocaust Victims Assets Litigation*, 105 F.Supp.2d 139, 144 (E.D.N.Y. 2000) (approving notice plan that involved forty-eight countries, including some individual notice, worldwide publication, public relations efforts, internet use, and community outreach). The circumstances of this case make it unlikely that publication notice, as Villagran proposes, could be effective. Publication or similar forms of notice can be effective only if the class members who see the notice are likely to recognize themselves as the class members described. If publication or similar form of notice was used in this case, and the notice was seen by individuals who were sent the mailings in 2005, it is highly unlikely that those individuals would remember that they received those particular mailings. It is highly unlikely that those individuals would recognize themselves as class members.

This case involves the receipt of unsolicited mailings, commonly known as "junk mail." Many people are likely to recall that they received unsolicited mailings in 2005. Few people will have any recollection about *what* unsolicited mailings they received in 2005. Individuals seeing a notice in 2007 stating that if they received an unsolicited mailing, in 2005, from these defendants, with certain terms, they may be a member of a class, are unlikely to recognize themselves as falling within that group. As Justice Ginsberg stated in

describing a similar problem in a different context, publication or similar forms of notice are likely to be ineffective when the putative class members are so "unselfconscious."[7] *Amchem Products, Inc.*, 521 U.S. at 628.

The inability to identify the vast majority of the members of the proposed class also makes it problematic that any of the statutory damages Villagran seeks to recover for the class could be distributed to individual class members.  Villagran asserts a right to recover up to $1,000 in statutory damages for each mailing sent to each class member, in addition to seeking the punitive damages and the attorneys' fees provided under the statute.  15 U.S.C. §§ 1681b, 1681n.  But if very few of those class members can be identified or given effective notice of their right to claim damages, very few of those class members will receive the individual statutory damages the FCRA provides.  By certifying the class as Villagran proposes, these class members would be bound by the result and precluded from filing their own FCRA suits but would not receive any of the damages provided by the statute.  A consumer class action is superior to individual suits because it allows people with claims worth too little to justify individual suits – so called negative-value claims – to obtain the

---

[7]*Amchem* addressed a settlement class of those exposed to asbestos, including those who had no present symptoms of illness.  The Court rejected the class, in part because those who did not know whether they would develop such symptoms or who did not even know that they were exposed and might become ill at some point in the future could not receive effective notice of the class.  "Family members of asbestos-exposed individuals may themselves fall prey to disease or may ultimately have ripe claims for loss of consortium. Yet large numbers of people in this category-future spouses and children of asbestos victims-could not be alerted to their class membership. And current spouses and children of the occupationally exposed may know nothing of that exposure.  Because we have concluded that the class in this case cannot satisfy the requirements of common issue predominance and adequacy of representation, we need not rule, definitively, on the notice given here. In accord with the Third Circuit, however, we recognize the gravity of the question whether class action notice sufficient under the Constitution and Rule 23 could ever be given to legions so unselfconscious and amorphous." *Amchem Products, Inc.*, 521 U.S. at 628 (internal citation omitted).

redress the law provides.  But if the consumer class action is likely to provide those with individual claims no redress, and if the consumer statute provides incentives to make individual suits worth filing, such as punitive damages and attorney's fees, the consumer class action is not superior to individual suits.

Villagran invokes *cy pres* as a way to overcome the problem created by the fact that she seeks millions of dollars in statutory damages based on the number of people sent mailings, with no ability to identify those people to distribute the statutory damages to them. The *cy pres* doctrine originated in the trust context to respond to situations in which funds in a charitable trust could no longer be devoted to the purpose for which the trust was created.  In the class action context, courts have applied *cy pres* primarily (although not exclusively) as a practical solution to the problem of settlement funds remaining after those class members who could be identified with reasonable effort received their distribution. *See, e.g., In re Airline Ticket Comm'n Antitrust Litigation*, 307 F.3d 679 (8th Cir. 2002); *Powell v. Georgia-Pacific Corp.*, 119 F.3d 703 (8th Cir. 1997); *In re Folding Carton Antitrust Litigation*, 744 F.2d 1252 (7th Cir. 1984); *see also Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1305 (9th Cir. 1990) ("Federal courts have frequently approved [the *cy pres*] remedy in the settlement of class actions where the proof of individual claims would be burdensome or distribution of damages costly."); *In re Agent Orange Product Liability Litigation MDL No. 381*, 818 F.2d 179, 185 (2d Cir. 1987) ("[S]ome 'fluidity' is permissible in the distribution of settlement proceeds.").  In such cases, courts may allow the undistributed settlement funds amounts to be paid to a group or for a purpose

43

that will indirectly benefit the class, while recognizing that the individual class members will receive no direct benefit.  2 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 10:17 (4th ed. 2002).

Villagran proposes using *cy pres* as a substitute for distributing damages to individual class members, even if the case is tried.  Courts have not endorsed such a broad use of *cy pres*.  *See, e.g., Molski*, 318 F.3d at 954 ("We have left open the question of whether a *cy pres* award can ever be used as a substitute for actual damages.").  To approve the use of *cy pres* as a substitute for distributing statutory damages to individual class members, as Villagran proposes, is at odds with the damages scheme Congress provided in the FCRA. The statute provides aggrieved individuals a right to receive damages for unlawful disclosures of their credit reports.  15 U.S.C. §§ 1681b, 1681n. Congress provided that a defendant who accesses a consumer's credit report for a purpose not permitted by the FCRA must pay that consumer either actual damages or a range of statutory damages.  Replacing the payment of statutory damages to individual class members with a *cy pres* payment intended to provide indirect benefits to the class – perhaps by a charitable contribution to a public interest organization focused on consumer rights – changes this compensation statute to something quite different.

One court has devised a framework for examining when *cy pres* might be appropriate in the class action context.  Rejecting any approach to class damages "which would automatically utilize a fluid recovery mechanism as a procedural alternative to class action disposition," the Second Circuit in *Simer v. Rios* laid out a three-step analysis to determine

whether *cy pres* is warranted.  661 F.2d 655, 676 (2d Cir. 1981).  Although few cases cite

this analysis, it is a useful way to illustrate the difficulties in using *cy pres* as Villagran

proposes.

Under *Simer*, "[t]he general inquiry is whether the use of such a mechanism is

consistent with the policy or policies reflected by the statute violated.  This matter can be

more particularized into an assessment of to what extent the statute embodies policies of

deterrence, disgorgement, and compensation." *Id.* at 676.  The first question is "whether a

fluid recovery is needed to deter the defendant from illegal conduct." *Id.*  In this case, the

relevant damages provision of the FCRA provides that a party is liable for "any actual

damages sustained by the consumer as a result of [a violation] or damages of not less than

$100 and not more than $1,000," punitive damages, attorney's fees, and costs.  15 U.S.C. §

1681n(a).  Under this provision, a court has discretion to fix a damage award within the

statutory range and may consider variables such as the actual amount of damages suffered,

willfulness, and other factors.  *See Aeschbacher v. Cal. Pizza Kitchen, Inc.*, No. CV

07-215VBFJWX, 2007 WL 1500853, at *3 (C.D. Cal. 2007 April 3, 2007); *Andrade v.*

*Chase Home Fin., L.L.C.*, No. 04 C 8229, 2005 WL 3436400, at *6 (N.D. Ill. December 12,

2005).  A court may decline to award statutory damages and instead award actual damages

in a particular case.  *Aeschbacher*, 2007 WL 1500853, at *3.  Because the statute provides

for punitive as well as statutory or actual damages and attorneys' fees, there are meaningful

incentives to individual suits and the deterrent effect they provide.  *Cy pres*, as Villagran

proposes to use it, might lead to more frequent use of class actions, which could increase

deterrence.  But that is a different question from whether *cy pres* is necessary to achieve the deterrent effect of the statute.

The second factor of the *Simer* test considers whether *cy pres* recovery would disgorge illegally obtained profits.  "Those cases where a corporate defendant engages in unlawful conduct and illegally profits [are] most appropriate for a fluid recovery."  *Id.*  As with the first factor, the second factor weighs against *cy pres* recovery in this case.  The statute does not provide for disgorgement and does not base damages on the amount of profits obtained.  Villagran did not argue that the defendants obtained specific profits from the allegedly improper use of consumers' credit information or seek the disgorgement of such amounts.    Under  the  third  factor,  the  court  examines  whether  the  statute  has  a compensatory purpose.   The FCRA recognizes that a consumer suffers harm when their privacy is invaded and provides actual or statutory damages to redress that harm.  But under *cy pres*, the individual class member would not receive the compensation provided by the statute.  In light of these three factors, *cy pres* would not appear necessary to further the substantive policies of the FCRA.

There is an obvious potential for abuse in refusing to certify a damages class under Rule 23(b)(3) when the defendants have destroyed the only effective way to identify the class members.  Allowing defendants who violate the FCRA to avoid class-action exposure by simply destroying the mailing lists they used to accomplish the violation is obviously problematic.  But the record in this case does not present this risk of abuse.  The record does not suggest that these defendants intentionally destroyed the information necessary to

recreate the list of mailing recipients.   Rather, the record shows that the defendants contracted with third parties who generated and destroyed the mailing lists. There is no evidence to suggest that either Freeway Ford or Prather exercised authority over that process. There is no evidence to suggest that either defendant knew about the destruction of the information or the policy that led to the destruction.   Freeway Ford hired AIM Data to generate the mailings.  AIM Data was responsible for creating the mailing and generating the list of recipients from its database of consumer credit information, based on the criteria that the defendants provided.  Although courts should be mindful of this potential abuse, in the present case there is no indication that it is present.

Villagran's motion for class certification as to the defendants' mailings is denied.

## VI.   Conclusion

Villagran's summary judgment motion and motion to strike the summary judgment evidence are denied.  The defendants' summary judgment motion is granted as to the mailing Villagran received and granted in part as to the other three mailings she challenges. Villagran's claims against Freeway Ford, Ltd. and Stephen E. Prather, Inc. based on the mailing she received are dismissed.  Her motion for class certification is denied as moot.

Final judgment will be entered by separate order.

SIGNED on September 10, 2007, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge